UNITED STATES of America,
Plaintiff,

v.

Willie HAYES, Defendant.

No. CR 12–4040–MWB.

United States District Court,
N.D. Iowa,
Western Division.

June 7, 2013.

Robert A. Knief, U.S. Attorney's Office, Sioux City, IA, for Plaintiff.

Jay Elliott Denne, Munger, Reinschmidt & Denne, Sioux City, IA, for Defendant.

## SENTENCING OPINION AND STATEMENT OF REASONS PURSUANT TO 18 U.S.C. § 3553(c) EXPLAINING A POLICY DISAGREEMENT WITH THE METHAMPHETAMINE GUIDELINES

MARK W. BENNETT, District Judge.

### TABLE OF CONTENTS

I.   INTRODUCTION ............................................................. 1011
    A.  Indictment, Guilty Plea, And Sentencing Hearing ..................... 1011
    B.  Arguments Of The Parties ........................................... 1011

II.  ILLEGAL ANALYSIS ...................................................... 1012
    A.  Sentencing Methodology ............................................. 1012
    B.  Policy Disagreement With The Methamphetamine Guidelines ............. 1014
       1.  Background on policy disagreement based variances ................. 1014
       2.  Flaws in the methamphetamine Guidelines .......................... 1018
          a.  Creation of methamphetamine Guidelines ....................... 1018
            i.  The Sentencing Commission's institutional role ............. 1018
            ii.  The methamphetamine Guidelines are not based on
                empirical data ........................................... 1022
          b.  The methamphetamine Guidelines are excessive ................. 1027
          c.  The methamphetamine Guidelines ranges are not heartlands ...... 1029
    C.  Application ......................................................... 1031

III. CONCLUSION ............................................................. 1033

IV.  APPENDIX ............................................................... 1033

This case raises the question of the merits of the United States Sentencing Guidelines[1] range, pursuant to U.S.S.G.

---

[1]. I refer to the United States Sentencing Commission as the "Commission" and the United States Sentencing Guidelines as the "Guidelines" throughout this opinion.

§ 2D1.1, for defendants convicted of methamphetamine offenses. In my nineteen years on the federal bench, I have sent over 3,500 people to prison, the majority of whom are drug offenders. Methamphetamine is the primary drug type involved in drug-trafficking offenses in the Northern District of Iowa. In 2011, methamphetamine offenses made up 18.1% of the drug trafficking offenses across the country. BOOKER REPORT, PART C: DRUG TRAFFICKING OFFENSES, METHAMPHETAMINE, at 1. That same year, methamphetamine offenses made up 72.3% of the drug trafficking offenses in the Northern District of Iowa. *Id.* at 2.

This Sentencing Memorandum supplements findings made on the record at defendant Willie Hayes's sentencing hearing on June 3, 2013.

## I. INTRODUCTION

### A. Indictment, Guilty Plea, And Sentencing Hearing

On March 21, 2012, an Indictment was returned against Hayes, with the charge that he did knowingly and unlawfully combine, conspire, confederate, and agree, with others whose identities are both known and unknown to the Grand Jury, to knowingly, intentionally, and unlawfully possess with the intent to distribute 5 grams or more actual (pure) methamphetamine or 50 grams of a methamphetamine mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance within 1,000 feet of Irving Elementary School, located in Sioux City, Woodbury County, Iowa, in violation of 21 U.S.C. §§ 846(a)(1), 841(b)(1)(B), 860, and 846. On January 30, 2013, Hayes pled guilty before U.S. Magistrate Judge Leonard T. Strand to Count 1 of the four-count superseding indictment, pursuant to a plea agreement (docket no. 76). Count 1 charged Conspiracy to Possess with the Intent to Distribute 35

Grams or More of Methamphetamine Actual, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B). On that same day, I accepted Hayes's guilty plea. A probation officer then prepared a presentence report ("PSR"). The PSR found that Hayes was a Career Offender because of two predicate felony convictions. On May 23, 2013, Hayes filed a Motion For Downward Departure And Variance (docket no. 92) and a well-drafted Sentencing Brief (docket no. 93) in which he raised several issues, including a cutting-edge issue on the methamphetamine Guidelines. For reasons only known to the prosecution, the government chose not to file a written resistance to Hayes's Motion.

At the sentencing hearing, Hayes moved for a downward departure and variance. He argued that there was an over-representation of criminal history, and asked that I decline to qualify the reckless use of firearm with bodily injury (PSR ¶¶ 20, 26) and the burglary offense (PSR ¶ 34) as predicate offenses. Next, Hayes argued that the application of the Career Offender enhancement overstates the seriousness of Hayes's criminal record, his risk of reoffending, and his culpability in relation to his federal offense. Hayes contended that the use of methamphetamine weight overstates the seriousness of Hayes's offense and his risk of reoffending. The prosecution made a motion for downward departure based on substantial assistance under U.S.S.G. § 5K1.1. After oral arguments and Hayes's allocution, I sentenced Hayes. This opinion explains and amplifies one of the rationales for my sentence. Many issues were covered at the sentencing hearing, but this opinion is limited to the issue of the methamphetamine Guidelines.

### B. Arguments Of The Parties

Hayes requests that I vary down from the applicable Guidelines range, based on the factors of 18 U.S.C. § 3553(a) and

policy disagreements with U.S.S.G. § 2D1.1(c)(5), because U.S.S.G. § 2D1.1(c)(5) yields an excessive sentence. Hayes argues that I should not rely on U.S.S.G. § 2D1.1(c)(5) and the PSR's weight of 38.1 grams of actual methamphetamine to determine Hayes's Guidelines sentence because the Commission strayed from its institutional role in crafting § 2D1.1(c)(5) and the Guidelines fail to promote the sentencing goals of 18 U.S.C. § 3553(a). Hayes examines the increase in Guidelines ranges for methamphetamine offenses over time, highlighting the manner in which the Commission drifted from its institutional role. Hayes asserts that his Guidelines range would have been 46–57 months in 1987 and it has increased roughly 360 % to his current Guidelines range of 168–210 months. Defendant's Brief at 28. Hayes, in an especially well-crafted brief, argues that the methamphetamine Guidelines should be given less deference than Guidelines that were properly crafted with empirical data and institutional expertise. Next, Hayes asserts that the methamphetamine Guidelines fail to promote the goals of sentencing in 18 U.S.C. § 3553(a) because they have a strong potential to overstate the seriousness of a defendant's record and risk of reoffending, resulting in unwarranted sentencing disparities.

I viewed the prosecution's failure to file a resistance to Hayes's Motion For Downward Departure And Variance (docket no. 92) as a waiver to argument on the methamphetamine Guidelines issue. *See* N.D. IA. L.R. Rule 7(f) ("If no timely resistance to a motion is filed, the motion may be granted without notice. If a party does not intend to resist a motion, the party is encouraged to file a statement indicating the motion will not be resisted."). However, I still allowed the prosecution to present arguments at the sentencing hearing. I considered the prosecution's arguments, none of which were remotely persuasive,

and I determined that the prosecution's position did not undermine the powerful rationale articulated by Judge Gleeson in *United States v. Ysidro Diaz,* No. 11–CR–00821–2 (JG), 2013 WL 322243 (E.D.N.Y. Jan. 28, 2013).

## II. LEGAL ANALYSIS

### A. Sentencing Methodology

Following the Supreme Court's decision in *Gall v. United States,* the Eighth Circuit Court of Appeals has repeatedly stated the methodology for determining a defendant's sentence as follows:

> The district court should begin "by correctly calculating the applicable Guidelines range." "[T]he Guidelines should be the starting point and the initial benchmark[, but] [t]he Guidelines are not the only consideration[.]" The district judge should allow "both parties an opportunity to argue for whatever sentence they deem appropriate," and then should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party."

*United States v. Hill,* 552 F.3d 686, 691 (8th Cir.2009) (quoting *Gall v. United States,* 552 U.S. 38, 49, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007)) (internal citations omitted); *United States v. Roberson,* 517 F.3d 990, 993 (8th Cir.2008); *see also United States v. Feemster,* 572 F.3d 455, 461–62 (8th Cir.2009) (*en banc*).

The Supreme Court has recognized that a party's argument for a sentence outside the calculated Guidelines range may "take either of two forms." *Rita v. United States,* 551 U.S. 338, 344, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007). A party may "argue *within the Guidelines' framework,* for a departure," *id.* (emphasis in original), or a party may "argue that, independent of the Guidelines, application of the factors set forth in 18 U.S.C. § 3553(a) warrants a

[different] sentence."[2] *Id.* The Eighth Circuit Court of Appeals has made clear that, while "similar factors may justify either a variance or a traditional departure," *United States v. Woods,* 670 F.3d 883, 888 (8th Cir.2012), district courts are not limited by the Guidelines' departure policy framework when determining whether and by what extent to vary, *see United States v. Chase,* 560 F.3d 828, 832 (8th Cir.2009); *United States v. VandeBrake,* 679 F.3d 1030, 1037 (8th Cir.2012); *see also United States v. Villareal–Amarillas,* 562 F.3d 892, 898 (8th Cir.2009) ("The judge is cabined, but also liberated, by the § 3553(a) factors.").[3]

As a matter of procedure, the Eighth Circuit Court of Appeals has instructed that district courts should "continue to engage in the three-step process of first ascertaining the applicable Guidelines range, then considering any permissible departures within the Guidelines' structure, and finally, deciding whether a non-Guidelines sentence would be more appropriate under the circumstances pursuant to § 3553(a)." *See United States v. Washington,* 515 F.3d 861, 866 (8th Cir.2008).

■ Although "a court of appeals may apply a presumption of reasonableness when conducting substantive review of a sentence within the advisory range, 'the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.' " *United States v.*

*Henson,* 550 F.3d 739, 740 (8th Cir.2008) (quoting *Rita,* 551 U.S. at 351, 127 S.Ct. 2456). The Supreme Court has emphasized this point, noting "[o]ur cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable," and that "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States,* 555 U.S. 350, 129 S.Ct. 890, 892, 172 L.Ed.2d 719 (2009) (*per curiam* ) (emphasis in the original).

■ As the Eighth Circuit Court of Appeals has also explained, "[w]e may not require " 'extraordinary' circumstances to justify a sentence outside the Guidelines." *Feemster,* 572 F.3d at 462 (quoting *Gall,* 552 U.S. at 47, 128 S.Ct. 586). Instead, the district court:

> must "make an individualized assessment based on the facts presented." [*Gall,* 552 U.S. at 50, 128 S.Ct. 586.] If the court concludes that a sentence outside of the Guidelines range is warranted, then it must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* "[A] major departure should be supported by a more significant justification than a minor one." *Id.* After the district court determines the "appropriate sentence," it must then "adequately explain the chosen sentence to allow for mean-

---

**2.** As the Eighth Circuit Court of Appeals has explained:

> " 'Departure' is a term of art under the Guidelines and refers only to non-Guidelines sentences imposed under the framework set out in the Guidelines." *Irizarry v. United States,* 553 U.S. 708, 128 S.Ct. 2198, 171 L.Ed.2d 28 (2008). A variance, on the other hand, is a "non-Guidelines sentence[ ] based on the factors enumerated in 18

U.S.C. § 3553(a)." *United States v. Solis–Bermudez,* 501 F.3d 882, 884 (8th Cir.2007). *United States v. Mireles,* 617 F.3d 1009, 1012 n. 2 (8th Cir.2010).

**3.** *See Irizarry,* 553 U.S. at 714–15, 128 S.Ct. 2198 ("[T]here is no longer a limit comparable to [a departure] on the variances from Guidelines ranges that a district court may find justified under the sentencing factors set forth in 18 U.S.C. § 3553(a).").

ingful appellate review and to promote the perception of fair sentencing." *Id.*

*Feemster,* 572 F.3d at 461.

At sentencing, my first step was to determine the advisory Guidelines range for Hayes. Second, I determined whether any traditional (non-substantial assistance) departures, either upward or downward, were warranted. Third, I considered whether to vary from the advisory Guidelines range based on my independent obligation to apply the 18 U.S.C. § 3553(a) factors, including any policy disagreements. I recognized that I may not rely on the 18 U.S.C. § 3553(a) factors sentencing factors to impose a sentence below the mandatory minimum required by statute, even when the prosecution has filed and I grant a substantial assistance motion under U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e). *See United States v. Madison,* 585 F.3d 412, 413 (8th Cir.2009). However, in cases like this one, where the Guidelines range exceeds the mandatory minimum, I may first consider the 18 U.S.C. § 3553(a) factors to reduce a defendant's sentence. Depending on the strength of the 18 U.S.C. § 3553(a) factors, this may include down to, but not below, the mandatory minimum. *See United States v. Coyle,* 506 F.3d 680, 683 (8th Cir.2007). Then, if I grant the prosecution's motion for downward departure, I may go below the mandatory minimum, but only by applying the U.S.S.G. factors contained in § 5K1.1. Finally, I decided the prosecution's motion for downward departure based on Hayes's substantial assistance.

### B. Policy Disagreement With The Methamphetamine Guidelines

In this section, I discuss my policy disagreement with the Guidelines range for methamphetamine offenses.

### 1. Background on policy disagreement based variances

■ Sentencing judges may impose sentences that vary from the Guidelines range based on a policy disagreement with the Guidelines. *See, e.g., Spears v. United States,* 555 U.S. 261, 263–67, 129 S.Ct. 840, 172 L.Ed.2d 596 (2009) (*per curiam*); *Kimbrough v. United States,* 552 U.S. 85, 109–10, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007). The Supreme Court held in *Kimbrough* that the Anti–Drug Abuse Act of 1986 "does not require ... sentencing courts ... to adhere to the 100–to–1 ratio for crack cocaine quantitates other than those that trigger the statutory mandatory minimum sentences." In discussing grounds for a variance from the Guidelines "[i]n *Kimbrough,* the Supreme Court held that it was not an abuse of discretion for a district court to vary from the Guidelines based on its policy disagreement concerning the disparity between crack and powder cocaine sentences." *United States v. Battiest,* 553 F.3d 1132, 1137 (8th Cir.2009) (citing *Kimbrough,* 552 U.S. at 110–111, 128 S.Ct. 558). Thus, "policy disagreements" may provide the basis for a variance from a Guidelines sentence, even in a "mine-run" case. *Kimbrough,* 552 U.S. at 109–110, 128 S.Ct. 558.

The Supreme Court clarified the issue of the district court's authority to vary from Guidelines sentences in *Spears,* which also involved the disparity between crack and powder cocaine sentences. In *Spears,* the Court explained that "a guideline may be rejected on categorical, policy grounds, even in a mine-run case, and not simply based on an individualized determination that it yields an excessive sentence in a particular case." *United States v. Beiermann,* 599 F.Supp.2d 1087 (N.D.Iowa 2009) (citing *Spears,* 555 U.S. at 262, 129 S.Ct. 840).

The powerful implication of *Spears* is that, in other 'mine-run' situations, the sentencing court may also reject Guidelines provisions on categorical, policy grounds—particularly when those Guidelines provisions "do not exemplify the Commission's exercise of its characteristic institutional role," *id.* (quoting *Kimbrough*, 552 U.S. at 89, 128 S.Ct. 558)—and may, consequently, adopt some other well-reasoned basis for sentencing. A number of federal courts of appeals have held that *Kimbrough* and *Spears* apply to policy disagreements with Guidelines other than those applicable to crack cocaine. *See, e.g., United States v. Henderson*, 649 F.3d 955, 963 (9th Cir.2011) (holding "district courts may vary from the child pornography Guidelines, § 2G2.2, based on a policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case."); *United States v. Grober*, 624 F.3d 592, 599–600 (3rd Cir.2010) (holding that while sentencing court has authority to vary from advisory Guidelines range based on its policy disagreement, when it does so it must provide "a reasoned, coherent, and sufficiently compelling explanation of the basis for [its] disagreement.") (quoting *United States v. Merced*, 603 F.3d 203, 220 (3d Cir.2010) (internal quotation marks omitted); *United States v. Corner*, 598 F.3d 411, 415 (7th Cir.2010) (*en banc*) ("We understand *Kimbrough* and *Spears* to mean that district judges are at liberty to reject any Guidelines on policy grounds—though they must act reasonably when using that power."); *United States v. Cavera*, 550 F.3d 180, 191 (2d Cir.2008) (en banc) ("As the Supreme Court strongly suggested in *Kimbrough*, a district court may vary from the Guidelines range based solely on a policy disagreement with the Guidelines, even where that disagreement applies to a wide class of offenders or offenses."); *United States v. Rodriguez*, 527 F.3d 221, 227 (1st Cir.2008) ("[*Kim-*

*brough*] makes plain that a sentencing court can deviate from the Guidelines based on general policy considerations.").

■ For the reasons discussed below, I join the few federal judges who have expressed a disagreement with the methamphetamine Guidelines. Judge Bataillon of the District of Nebraska has recognized the flaws in the methamphetamine Guidelines in a series of opinions. *See, e.g., United States v. Goodman*, 556 F.Supp.2d 1002, 1016 (D.Neb.2008) (varying downward in a conspiracy to manufacture methamphetamine case and holding that "[a] variance is appropriate in view of the fact that the Guidelines at issue were developed pursuant to statutory directive and not based on empirical evidence."); In *United States v. Hubel*, 625 F.Supp.2d 845, 853 (2008), Judge Bataillon analyzes the flawed creation of the methamphetamine Guidelines:

> For policy reasons, and to conform to statutory mandatory minimum sentences, the Commission did not employ its characteristic empirical approach when setting the Guidelines ranges for drug offenses. *Kimbrough*, 552 U.S. at 96, 128 S.Ct. at 567; Fifteen–Year Assessment at 15, 72–73. Instead, the Commission attempted "to accommodate and, to the extent possible, rationalize mandatory minimum provisions established by the 1986 Anti–Drug Abuse Act" by anchoring the Guidelines to the mandatory minimum sentences. United States Sentencing Commission, Special Report to Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System (August 1991), accessed at *www.ussc.gov/reports.htm* (hereinafter, "Mand.Min.Rep't"), Summary at ii; Rep't at 17 n.58.

> The Commission thus adopted "the 1986 [Anti–Drug–Abuse] Act's weight-driven scheme." *Kimbrough*, 552 U.S.

at 96, 128 S.Ct. at 567; *see Chapman v. U.S.*, 500 U.S. 453, 461, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991) (stating that the Anti–Drug Abuse Act of 1986 provided for mandatory minimum sentences based on the weight of various controlled substances according to a "market-oriented" approach, creating a penalty scheme intended to punish large-volume drug traffickers severely). "The 1986 Act uses the weight of the drugs involved in the offense as the sole proxy to identify 'major' and 'serious' dealers." [FN1] *Kimbrough*, 128 S.Ct. at 567. The resulting Guidelines ranges for drug trafficking offenses are driven by the quantity of drugs, and keyed to statutory mandatory minimum sentences based on weight. *Gall*, 128 S.Ct. at 594 & n. 2; *Neal v. United States*, 516 U.S. 284, 291–92, 116 S.Ct. 763, 133 L.Ed.2d 709 (1996) (noting that in spite of "incongruities between the Guidelines and the mandatory sentencing statute," the Commission developed Guidelines to parallel the mandatory minimum sentences set out in 21 U.S.C. § 841(b)(1), using the quantities and sentences derived from the statute and "[t]he weight ranges reflect the Commission's assessment of equivalent culpability among defendants who traffic in different types of drugs . . .").

FN1. Although both the mandatory minimum statutes and the Guidelines calibrate punishment of drug traffickers according to quantity, the Supreme Court has acknowledged that mandatory minimum sentences are both structurally and functionally at odds with sentencing guidelines and the goals the Guidelines seek to achieve, noting that "the guidelines produce a system of finely calibrated sentences with proportional increases whereas the mandatory minimums result in 'cliffs.'" *Neal*, 516 U.S. at 291, 116 S.Ct. 763 (1996). Nonetheless, the Supreme Court has continued to affirm the scheme, leaving it to Congress to correct its disparities. *Id.*; *United States v. LaBonte*, 520 U.S. 751, 764, 117 S.Ct. 1673, 137 L.Ed.2d 1001 (1997).

Noting that larger drug dealers were subject to a mandatory minimum of ten years for a first offense and twenty years for a subsequent conviction for the same offense, the Sentencing Commission stated that "[the Act] sought to cover mid-level players in the drug distribution chain by providing a mandatory minimum penalty of five years." *Id.* at 10. Later, in "[p]erhaps the most far-reaching provision of the Omnibus Anti–Drug Abuse Act of 1988," Congress made the mandatory minimum penalties that were previously applicable to substantive distribution and importation/exportation offenses apply also to conspiracies to commit those substantive offenses, increasing "the potential that the applicable penalties could apply equally to the major dealer and the mid- or low-level participant." *Id.* at 10.

*United States v. Hubel*, 625 F.Supp.2d 845, 849–51 (D.Neb.2008). In support of his under-the-guidelines sentence, Judge Bataillon discusses the problems with the methamphetamine Guidelines' approach:

The court has considered the Sentencing Guidelines, but, because they were promulgated pursuant to Congressional directive rather than by application of the Sentencing Commission's unique area of expertise, the court affords them less deference than it would to empirically-grounded Guidelines. *See Kimbrough*, 552 U.S. at 107–10, 128 S.Ct. at 574–75. The Guidelines' quantity-driven, "market-oriented" approach is not a proxy for culpability in every case, nor does it always correlate to the purposes of sentencing under 18 U.S.C. § 3553(a). Drug quantity is only an accurate measure when it corresponds to a defendant's position in the typical hierarchy that characterizes most drug conspiracies. Where the defendant falls in this hierarchy is an important factor in the court's assessment of a defendant's ultimate cul-

pability. Although the quantity-based system was designed to punish bigger distributors more harshly, charging practices and the government's control over the number and amount of controlled buys from undercover or cooperating agents can result in an erroneous impression that a long-term, small-quantity distributor is a large-quantity distributor.

*Id.* at 853. This position is consistent with Judge Bataillon's long-standing disagreement with the methamphetamine Guidelines on policy grounds. *See United States v. Woody,* 2010 WL 2884918, *10 (D.Neb. July 20, 2010) (affording less deference to the methamphetamine Guidelines range since it was "promulgated pursuant to Congressional directive rather than by application of the Sentencing Commission's unique area of expertise" and varying downward where quantity does not accurately reflect culpability); *United States v. Ortega,* 2010 WL 1994870 (D.Neb. May 17, 2010) (recognizing the "guidelines for methamphetamine crimes were anchored to mandatory minimum sentences, not based on empirical study" and finding an outside-the-guidelines sentence necessary to reflect defendant's minor role in a methamphetamine conspiracy and to avoid unwarranted sentencing disparity); *United States v. Nincehelser,* 2009 WL 872441 (D.Neb. Mar. 30, 2009) (sentencing below the Guidelines because the "the drug offense Guidelines were promulgated pursuant to Congressional directive rather than by application of the Sentencing Commission's unique area of expertise" and concluding that the quantity-based approach is "not always a trustworthy measure of the culpability of an individual defendant"); *United States v. Castellanos,* 2008 WL 5423858 (D.Neb. December 29, 2008) (granting defendant's motion for downward departure and concluding that the methamphetamine Guidelines should be afforded less deference since they are not

empirically-grounded); *United States v. Rocha,* 2008 WL 2949242 (D.Neb.2008) (finding that the methamphetamine Guidelines are not empirically-grounded and granting defendant's downward variance in a conspiracy to distribute and possess with intent to distribute methamphetamine mixture case); *United States v. McCormick,* 2008 WL 268441, at *10 (D.Neb. Jan. 29, 2008) (varying downward after finding that "[t]he Guidelines ranges of imprisonment for possession of precursor chemicals were, like the drug-trafficking Guidelines, determined with reference to statutory directives and not grounded in empirical data").

Other courts have held that a district court judge may disagree with the methamphetamine Guidelines on policy grounds. *See, e.g., United States v. Valdez,* 268 Fed.Appx. 293 (5th Cir.2008) (affirming an upward variance based on purity of crystal methamphetamine and holding that "the district court judge can disagree with the Guidelines' policy that purity is indicative of role or that purity is adequately provided for in [defendant's] base level."); *United States v. Santillanes,* 274 Fed.Appx. 718, 718–19 (10th Cir.2008) (remanding for sentencing after prosecution conceded that it was error for the district court to conclude it did not have the power to accept defendant's argument based on a policy disagreement with the methamphetamine Guidelines).

Beyond methamphetamine, other courts have disagreed with the drug-trafficking Guidelines on the same grounds with different types of drugs. *See, e.g., United States v. Ysidro Diaz,* No. 11–CR–00821–2 (JG), 2013 WL 322243 (E.D.N.Y. Jan. 28, 2013) (expressing a policy disagreement with the Guidelines for heroin, cocaine, and crack offenses); (*United States v. Cabrera,* 567 F.Supp.2d 271 (D.Mass.2008) (varying downward and rejecting the cocaine guideline on the basis of "the over-emphasis on quantity and the under-emphasis on role in

the offense"). In *Diaz,* Judge Gleeson thoughtfully critiqued the drug-trafficking guidelines, providing a comprehensive policy disagreement with the Guidelines for heroin, cocaine, and crack offenses that also applies to methamphetamine offenses. *Diaz,* 2013 WL 322243. He discussed the flawed creation of the drug Guidelines and how they are not based on empirical data and national experience. *Id.* at *3–7. Judge Gleeson described the overly punitive weight-driven regime. *Id.* at *7. He analyzed the pattern of sentencing to conclude that the drug-trafficking offenses have never been heartlands. *Id.* *8–9. Judge Gleeson discussed the relationship between the drug Guidelines and the problem of mass incarceration. *Id.* at *10–11 ("Perhaps the best indication that the Guidelines ranges for drug trafficking offenses are excessively severe is the dramatic impact they have had on the federal prison population *despite* the fact that judges so frequently sentence well below them."). Judge Gleeson recommended that the Commission de-link the Guidelines from the ADAA in order to revise the drug tracking Guidelines to better reflect a defendant's true culpability. *Id.* at *11–18. Until systematic changes can be made, Gleeson recommended "lower[ing] the ranges in drug trafficking cases by a third." *Id.* at *18. Judge Gleeson's cogent analysis provides valuable insight into the flawed drug-trafficking Guidelines.

### 2. *Flaws in the methamphetamine Guidelines*

This section describes the flaws in the methamphetamine Guidelines, which support my policy disagreement.

### a. *Creation of methamphetamine Guidelines*

### i. *The Sentencing Commission's institutional role*

The Sentencing Reform Act of 1984 ("SRA"), a chapter of the Comprehensive Crime Control Act of 1984, Pub.L. 98–473, 98 Stat. 2068, created the Sentencing Commission.[4] *See Dorsey v. United States,* —— U.S. ——, 132 S.Ct. 2321, 2326, 183 L.Ed.2d 250 (2012); *Southern Union Co. v. United States,* —— U.S. ——, 132 S.Ct. 2344, 2358, 183 L.Ed.2d 318 (2012). The Commission was directed to promulgate sentencing Guidelines to take effect on November 1, 1987. 18 U.S.C. § 3551 (1987). The Commission was instructed to reconcile the multiple purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2), to provide certainty and fairness, to avoid unwarranted sentencing disparities, to seek proportionality, and to reflect advancement of knowledge of human behavior. Pub.L. No. 98–473, §§ 217(a), 239, 98 Stat. 1987 (1984); 28 U.S.C. § 991(b)(1). Congress directed the Commission to ascertain data on the average sentences imposed for particular categories of cases prior to creation of the Commission, but specifically noted that the Commission "shall not be bound by such average sentences, and shall independently develop a sentencing range that is consistent with the purposes of sentencing." 28 U.S.C. § 994(m). Further, the SRA directed the Sentencing Commission to "develop means of measuring the degree to which the [Guidelines] are effective in meeting the purposes of sentencing," 28 U.S.C. § 991(b)(2), and was granted exten-

---

**4.** The Comprehensive Crime Control Act was a lengthy piece of legislation that revised many other aspects of the federal criminal justice system including the penalty schemes for federal drug offenders, bail reform measures, and the establishment of a crime victims fund. *See* Controlled Substances Penalties Amendments Act, Pub.L. 98–473, Tit. II, ch. V, 98 Stat. 2068 (penalty scheme revisions); the Bail Reform Act of 1984, Pub.L. 98–473, Tit. II, ch. I, 98 Stat. 1976 (bail); and Victims of Crime Act of 1984, Pub.L. 98–473, Tit. II, ch. XIV, 98 Stat. 2170 (creation of crime victims fund).

sive research powers to do so.[5]  28 U.S.C. § 995(a)(12)-(16).

In developing the Guidelines, the original Commissioners were unable to reconcile different philosophical perspectives to create a governing philosophy for the Guidelines.  U.S. Sentencing Guidelines Manual § 1A.1.3 (1987).  Justice Breyer, then Judge and original sentencing commissioner, described the process towards compromise:

> Faced, on the one hand, with those who advocated "just deserts" but could not produce a convincing, objective way to rank criminal behavior in detail, and, on the other hand, with those who advocated "deterrence" but had no convincing empirical data linking detailed and small variations in punishment to prevention of crime, the Commission reached an important compromise.  It decided to base the Guidelines primarily upon typical, or average, actual past practice.

Stephen Breyer, The Federal Sentencing Guidelines and the Key Compromises upon Which They Rest, 17 Hofstra L.Rev. 1, 7 (1988).  Pre–Guidelines sentencing data was the "starting point" for the Commission's compromise.  U.S. Sentencing Guidelines Manual § 1A.1.3 (1987).  "The information derived provided a numerical anchor for guideline development."  U.S. Sentencing Comm'n, Supplementary Report On The Initial Sentencing Guidelines And Policy Statements 22 (1987), available at http:// www.fd.org/docs/select–topics—

sentencing/Supplementary–Report.pdf [hereinafter Supplementary Report].  According to Justice Breyer, the Sentencing Commission developed the first set of Guidelines through an empirical approach, examining 10,000 presentence reports, and determining average sentences imposed before the Guidelines, Rita, 551 U.S. at 349, 127 S.Ct. 2456, and that, as directed in 28 U.S.C. § 994(p), the Sentencing Commission could revise the Guidelines thereafter by studying federal court decisions and seeking advice from prosecutors, law enforcement personnel, defense counsel, civil liberties groups, and experts.[6]  Id. at 350, 127 S.Ct. 2456.  "The result is a set of Guidelines that seek to embody the § 3553(a) considerations, both in principle and in practice."  Id.; see U.S. Sentencing Comm'n, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform 72–73 (2004) [Hereinafter Fifteen-Year Assessment].  The Court has repeatedly praised the empirical process by which the Guidelines were written.  See, e.g., Kimbrough 552 U.S. at 108–09, 109–110, 128 S.Ct. 558; United States v. Booker, 543 U.S. 220, 252–56, 264–65, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005); Gall v. United States, 552 U.S. 38, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007) ("[The Guidelines are] the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sen-

---

**5.**  As Justice Breyer recognized in his concurrence in Pepper:

> The trial court typically better understands the individual circumstances of particular cases before it, while the Commission has comparatively greater ability to gather information, to consider a broader national picture, to compare sentences attaching to different offenses, and ultimately to write more coherent overall standards that reflect nationally uniform, not simply local, sentencing policies.

Pepper v. United States, —— U.S. ——, 131 S.Ct. 1229, 1254, 179 L.Ed.2d 196 (2011) (Breyer, J., concurring in part and concurring in the judgment).

**6.**  As the Court explained in Kimbrough, one of the Sentencing Commission's institutional strengths is its capacity to base "determinations on empirical data and national experience, guided by a professional staff with appropriate expertise."  Kimbrough, 552 U.S. at 109, 128 S.Ct. 558 (internal citation and quotation marks omitted).

tencing decisions."). The Commission relied on past sentencing statistics to establish the offense levels for each type of crime. FIFTEEN-YEAR ASSESSMENT 14.

However, the Sentencing Commission has not always followed the "characteristic institutional role" described in the SRA and by the Court in *Rita,* resulting in Guidelines that are unlikely to properly reflect 18 U.S.C. § 3553(a) considerations. *See Kimbrough,* 552 U.S. at 101–02, 128 S.Ct. 558. Swayed by policy reasons and pressure to conform to statutory minimums, the Commission did not use this empirical approach in developing the Guidelines ranges for drug-trafficking offenses. *Kimbrough,* 552 U.S. at 96, 128 S.Ct. 558; *Hubel,* 625 F.Supp.2d at 849; *Diaz,* 2013 WL 322243, at *4 (explaining that "empirical data on drug trafficking offenses were gathered, but they had *no* role in the formulation of the Guidelines ranges for drug trafficking offenses"). After Len Bias, the star University of Maryland basketball player, died of a drug overdose, on June 19, 1986, Congress swiftly enacted the Anti–Drug Abuse Act of 1986 ("ADAA" or "1986 Act"). *See Diaz,* 2013 WL 322243, at *4. The ADAA established a two-tiered system with five and ten-year mandatory minimum sentences for drug offenses, and the "Commission drafted new guidelines to accommodate these mandatory minimum provisions by anchoring the guidelines to them." REPORT TO CONGRESS: MANDATORY MINIMUM PENALTIES IN THE FEDERAL CRIMINAL JUSTICE SYSTEM at ii (2011), available at http://www.ussc.gov/ Legislative_and_Public_Affairs/ Congressional_Testimony_and_Reports/ Mandatory_Minimum_Penalties/20111031_ RtC_PDF/Executive_Summary.pdf [hereinafter MANDATORY MINIMUM REPORT].

Even though the mandatory minimum sentences for drug-trafficking offenses in the Anti–Drug Abuse Act of 1986 ("ADAA" or "1986 Act") were much higher than the pre-guidelines sentences for the same offense, the Commission incorporated the mandatory minimum provisions of the ADAA into the Guidelines, which are based on drug type and quantity. "It jettisoned its data entirely and made the quantity-based sentences in the ADAA proportionately applicable to every drug trafficking offense." *Diaz,* 2013 WL 322243, at *6. The ADAA's "weight-driven scheme" relies on "a drug quantity table based on drug type and weight to set base offense levels for drug-trafficking offenses." MANDATORY MINIMUM REPORT; *see U.S.S.G.* § 2D 1.1(c). "The resulting Guidelines ranges for drug trafficking offenses are driven by the quantity of drugs, and keyed to statutory mandatory minimum sentences based on weight." *Woody,* 2010 WL 2884918 at *5 (citing *Gall,* 128 S.Ct. at 594 n. 2; *Neal v. United States,* 516 U.S. 284, 291–92, 116 S.Ct. 763, 133 L.Ed.2d 709 (1996)). According to the legislative history, the two-tiered penalty structure of the ADAA was intended to punish "discrete categories of drug traffickers," such as drug kingpins and organizers. MANDATORY MINIMUM REPORT 24. During floor debate, Senate Minority Leader Robert Byrd explained the intent of the scheme:

> For the kingpins—the masterminds who are really running these operations— and they can be identified by the amount of drugs with which they are involved—we require a jail term upon conviction. If it is their first conviction, the minimum term is 10 years.... Our proposal would also provide mandatory minimum penalties to the middle-level dealers as well. Those criminals would also have to serve time in jail. The minimum sentences would be slightly less than those for the kingpins, but they nevertheless would have to go to jail—a minimum of 5 years for the first offense.

U.S. SENTENCING COMM'N, SPECIAL REPORT TO CONGRESS: COCAINE AND FEDERAL SENTENCING POLICY 119 (Feb. 1995) (citing 132 Cong. Rec. S. 14,300 (Sept. 30, 1986)). Yet, the severe sentences mandated by the ADAA are triggered by weight "as the sole proxy to identify 'major' and 'serious' dealers, ignoring the role of the offender." *Kimbrough,* 552 U.S. at 95, 128 S.Ct. 558.

There is certainly reason to question the Commission's empirical process, and the Commission's efforts in crafting the drug-trafficking Guidelines have been subject to methodological criticism. Regarding the Commission's methodology, the Supplementary Report lacks complete information and contains inconsistencies. Bernard E. Harcourt, *From The Ne'er–Do–Well To The Criminal History Category: The Refinement Of The Actuarial Model In Criminal Law,* 66 L. & CONTEMP. PROBS. 99, 123–25 (2003) ("[The Commission's] actual methodology is somewhat mysterious; the methodological appendix to the sentencing guidelines does not meet social science standards and seems almost deliberately intended to obfuscate discussion of the methods used." *Id.* at 123. Also, the Commission's data did not provide a complete picture for the Commissioners because analysis of the length of sentences did not reveal all the influential factors involved in the sentencing decision. *See* Carissa Byrne Hessick, *Appellate Review of Sentencing Policy Decisions After Kimbrough,* 93 MARQ. L. REV. 717, 728 n.64 (2009) (noting that Justice Breyer acknowledged the Commission's uncertainty as to how a sentencing judge would weigh various factors). Also, the data was skewed because the Commission excluded sentences of probation in its analysis, which constituted about half of the pre-Guidelines sentences. *See, e.g.,* Marc L. Miller, *Domination & Dissatisfaction: Prosecutors as Sentencers,* 56 STAN. L. REV. 1211, 1222 (2004) ("Before the guidelines, almost 50% of federal sentences were to straight probation. Under the initial guidelines, that figure dropped to around 15 %.").

The original Commission failed to explain why it applied the "quantity-based" approach of the ADAA mandatory minimums to every drug trafficking sentence. FIFTEEN-YEAR ASSESSMENT. In 2004, the Commission acknowledged that "documents published at the time of guideline promulgation do not discuss why the [original] Commission extended the ADAA's quantity-based approach in this way." *Id.* Although the Commission researched past sentencing practices, the "data was skewed, and at times, ignored." Judge Nancy Gertner, *From Omnipotence to Impotence: American Judges and Sentencing,* 4 OHIO ST. J. CRIM. 523, 534 (2007). The legislative history on the Commission's development of the Guidelines is sparse. *Id.* at 535. In his dissent in *Spears,* Judge Bye quoted the Commission's 2002 report to underscore the haste in which the ADAA passed through Congress:

"Congress bypassed much of its usual deliberative process" when it passed the Anti–Drug Abuse Act of 1986 "[b]ecause of the heightened concern and national sense of urgency surrounding drugs generally and crack cocaine specifically[.]" 2002 Report at 5. "As a result, there were no committee hearings and no Senate or House Reports accompanying the bill that ultimately passed.... Thus, the legislative history for the bill that was enacted into law is limited primarily to statements made by senators and representatives during floor debates." *Id.* at 5–6.

*United States v. Spears,* 469 F.3d 1166, 1182 (8th Cir.2006) (Bye, J., dissenting), rev'd 555 U.S. 261, 129 S.Ct. 840, 172 L.Ed.2d 596 (2009) (*per curiam* ). In his dissenting opinion in *Mistretta v. U.S.,*

Justice Scalia compared the Commission to "a sort of junior-varsity Congress," suggesting that the Commission lacked expertise in penology and responded quickly to political pressure. *Id.* (quoting *Mistretta v. U.S.*, 488 U.S. 361, 427, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989)). Justice Scalia's sharp critique of the Commission appears to have merit. The original Commission acknowledged, in vague terms, the influence of the ADAA:

> Recent legislative direction was an important consideration and, if particularly clear, essentially superseded the current-practice analyses. Thus, the sentences for drug offenses, which reflect the recent passage of the Anti–Drug Abuse Act, are much higher than in current practice. The guidelines for drug offenses do, however, draw upon current practice to some extent.

Supplementary Report at 18. In Breyer's analysis of the Guidelines process, he described the ADAA as a "change in the law independent of the Guidelines." *Breyer, supra,* at 24 n. 121. "It is important to remember that the Guidelines consider only *past* sentencing practices, and that some federal legislation contains stricter minimum sentences [ADAA] that will increase the federal prison population significantly." *Id.* at 24. This perspective suggests the Commission did not have any control regarding the adoption of the ADAA to the Guidelines. Breyer's thorough explanation of the Commission's creation of the Guidelines lacks any discussion of the role of mandatory minimum penalty statutes or any Congressional directives related to the ADAA. *See* Paul J. Hofer, *Empirical Questions and Evidence in*

*Rita v. United States,* 85 DENV. U.L. REV. 27, 47 (2007).

In *Kimbrough,* the Supreme Court found that the Guidelines' 100:1 powder/crack ratio was not based on the Sentencing Commission's empirical research, but, instead, was simply borrowed from the ratio Congress used to set minimum and maximum sentences in the ADAA. *Id.* at 95–96, 128 S.Ct. 558. In turn, the ADAA's ratio was based on Congress's mere assumptions regarding the relative dangerousness of crack. *Id.* at 95, 128 S.Ct. 558. After adopting the 100:1 ratio in the original Guidelines, the Sentencing Commission's research revealed that many of the assumptions used to justify the 100:1 ratio were baseless. *Id.* at 97–98, 128 S.Ct. 558. As a result, the Sentencing Commission attempted to amend the Guidelines to reduce the ratio to 1:1, but Congress blocked this attempt pursuant to 28 U.S.C. § 994(p), which provides that Guideline amendments become effective unless disapproved by Congress. *Id.* at 99, 128 S.Ct. 558. Given that the 100:1 ratio was expressly contrary to the Sentencing Commission's own research, the Court held that the ratio did not "exemplify the Commission's exercise of its characteristic institutional role." *Id.* at 109, 128 S.Ct. 558. As with the crack cocaine Guidelines, the Sentencing Commission strayed from its institutional role with the methamphetamine Guidelines.

### ii. The methamphetamine Guidelines are not based on empirical data

The methamphetamine Guidelines have evolved through a series of amendments over the years, and the penalties for methamphetamine offenses have increased dramatically.[7] For example, with a criminal

---

7. For a comprehensive history of the methamphetamine amendments from 1988 to 2012, see Amy Baron–Evans, Promulgation and Amendment of U.S.S.G. § 2D1.1, Methamphetamine Offenses: 1998–2012, available at http://ca7.fd.org/Indiana_Southern/Documents/Baron–Evans–%20Meth%20Promulgation%20and%20Amendment%20History.pdf [hereinafter Methamphetamine Offenses].

history category VI and 38.1 grams of methamphetamine actual, Hayes's base offense level is 30 and his Guidelines range is 168–210 months. As Hayes points out in his brief, his Guidelines range has increased about 360% since 1987. Defendant's Brief at 28.

The initial sentencing Guidelines, following the mandatory minimum quantity thresholds established in the ADAA "did not list methamphetamine in the drug table because they were not subject to the 1986 Act. U.S. SENTENCING COMM'N, METHAMPHETAMINE: FINAL REPORT OF THE WORKING GROUP 7 (1999), *available at* http://www.ussc.gov/Research/Working_Group_Reports/Drugs/199911_Meth_Report.pdf [hereinafter METHAMPHETAMINE REPORT]. When the initial Guidelines took effect on November 1, 1987, methamphetamine was listed in the "Drug Equivalency Tables" as a Schedule II stimulant with an equivalency equal to twice that of cocaine. *Id.* While the reasoning is unknown, the Commission made 1 gram of methamphetamine equal to 2 grams of cocaine. Methamphetamine Offenses, at 1. If Hayes were sentenced for the same offense in 1987, he would have a base offense level of 16 and a Guidelines range of 46–57 months. U.S. SENTENCING COMM'N, GUIDELINES MANUAL 239 (1987); Defendant's Brief at 28–30.

The Anti–Drug Abuse Act of 1988 established mandatory minimums for methamphetamine trafficking offenses. METHAMPHETAMINE REPORT 7. The Commission incorporated the mandatory minimums to correspond the Guidelines ranges at base offense levels 26 and 32 to the triggering quantities. Methamphetamine Offenses, at 1. Pursuant to the 1988 Act, 10 grams of methamphetamine or 100 grams methamphetamine mixture triggered the 5–year minimum, and 100 grams methamphetamine or 1 kilogram methamphetamine mixture triggered the 10–year minimum. METHAMPHETAMINE REPORT at 7–8. Thus, there was a 10:1 quantity ratio between the 10–year and 5–year minimums. *Id.* at 8. The 1988 Act also used a 10:1 ratio for mixture to pure substance.[8] *Id.* As a result, in 1989, Hayes would have had a base offense level of 26, increasing his Guidelines range to 120–150 months. U.S.S.G. § 2D1.1(c)(9) (1989) (stating that "at least 10 g but less than 40 g of pure methamphetamine" result in a base offense level 26); Defendant's Brief at 31. In 1989, Hayes's offense would have triggered the five-year mandatory minimum.

The Crime Control Act of 1990 instructed the Commission to increase the methamphetamine Guidelines for Ice by two levels. METHAMPHETAMINE REPORT at 9. The Commission amended the Guidelines in 1991, making both Ice and actual methamphetamine four to eight levels higher than mixture. Methamphetamine Offenses, at 3. "[T]he Commission reasoned that it could best achieve the enhanced punishment purpose of the instruction in a manner consistent with the Guidelines' structure by treating Ice, a form of methamphetamine that typically was 80 to 90 percent pure, as if it were 100 percent pure methamphetamine." METHAMPHETAMINE REPORT at 9.

In 1991, the Commission amended the Drug Equivalency Tables to simplify the Guidelines calculations for when multiple drugs are involved by expressing the equivalences for all controlled substances

---

**8.** For comparison, in 1989, 1 gram pure methamphetamine = 10 grams methamphetamine mixture = 10 grams heroin = 50 grams cocaine = 10 kilograms marijuana = 500 milligrams crack. *See* Amy Baron–Evans, Variance, Departures, and Deconstructing the Meth Guidelines: Current Trends and Cautionary Tales, CJA Trial Panel Annual Training (Dec. 12, 2012), at 109, *available at* http://ca7.fd.org/Indiana_Southern/Documents/Baron–Evans–%20Slides.pdf.

in terms of weights of marijuana. *Id.* at 10 (Amend. 396). As a result, 1 gram of methamphetamine mixture was equated to 1 kilogram of marijuana and 1 gram of actual methamphetamine was equated to 10 kilograms of marijuana. *Id.*

In the Comprehensive Methamphetamine Control Act of 1996, Congress instructed the Commission to amend the Guidelines by increasing the punishment for methamphetamine trafficking offenses. *Id.* The Commission added a two-level enhancement if the defendant knew the chemicals were imported unlawfully, a two-level enhancement for an environmental offense, and it cut the quantity in half for methamphetamine mixture. *Id.* at 11. "As a result, the quantity of methamphetamine mixture needed to trigger a Guidelines range corresponding to the statutory mandatory minimum sentences was 50 grams for five years (compared to 100 grams under the statute) and 500 grams for ten years (compared to 1000 grams in the statute)." Methamphetamine Offenses, at 6. The ratio between mixtures to actual methamphetamine changed from 10:1 to 5:1. Methamphetamine Report at 11.

In the Methamphetamine Trafficking Penalty Enhancement Act of 1998, Congress cut the quantities of both methamphetamine mixture and actual methamphetamine necessary to trigger the five and ten year mandatory minimums. *Id.* at 12. "As a result, offenses involving 5 grams of methamphetamine (actual) are assigned a base offense level 26, and offenses involving 50 grams of methamphetamine (actual) are assigned a base offense level 32." Methamphetamine Offenses, at 10. Therefore, after October 21, 1998, the five-year mandatory minimum is triggered by 5 grams of methamphetamine or 50 grams of methamphetamine, and the ten-year mandatory minimum is triggered by 50 grams of methamphetamine mixture or 500 grams of methamphetamine mixture. Methamphetamine Report at 12. Equal treatment of methamphetamine actual and crack was "an overt objective noted and apparently sought by some sponsors of the legislation." *Id.*

The current Guidelines distinguish between two forms of methamphetamine powder: actual and mixture. There are two methods for determining a defendant's base offense level in methamphetamine powder cases, either by the weight of the actual methamphetamine contained within a mixture or by the weight of the entire mixture containing a detectable amount of methamphetamine. U.S.S.G. § 2D1.1(c).[9] According to the Guidelines' drug quantity table, base offense levels for methamphetamine offenses range from 12, for offenses involving less than 2.5 grams of methamphetamine, or less than 250 MG of methamphetamine (actual) or less than 250 MG of "Ice"; to level 38, involving offenses of

---

9. As explained in the Mandatory Minimum Report:

Methamphetamine exists in two identifiable forms: (1) as a powder, soluble in water or alcohol; and (2) in crystalline form. The latter, commonly referred to as Ice, is the variant used for smoking the substance. As a powder, the drug is injected, swallowed, or snorted. The Drug Quantity Table specifically references Ice and methamphetamine; distinguishing the latter for sentencing purposes between the pure drug (meth-actual) and a mixture of the drug with adulterants (meth-mix). Methamphetamine-actual and -mix are not different forms of the substance but rather are alternative methods of measuring the severity of the offense both under the mandatory minimum statutes and the guidelines. In a given methamphetamine case (other than Ice), the applicable penalty is the greater of that for the weight of the methamphetamine-mixture, or the amount of actual/pure methamphetamine contained in the mixture, as determined by expert laboratory analysis. Mandatory Minimum Report at 14 n.40.

15 kilograms or more of methamphetamine, or 1.5 kilograms or more of methamphetamine (actual), or 1.5 KG or more of "Ice." U.S.S.G. § 2D1.1(c). The Guidelines reflect a ratio of ten to one between the penalties for distribution of a mixture as compared to distribution of the pure form. U.S.S.G. § 2D1.1(c). The quantities in the Guidelines table correspond to the mandatory minimum provisions applicable to methamphetamine offenses. *Woody*, 2010 WL 2884918, at *5; *compare* 21 U.S.C. §§ 841(b)(1)(A)(viii) & 841(b)(1)(B)(viii) *with* U.S.S.G. § 2D1.1(c)(4) & (7). 50 grams of methamphetamine triggers a mandatory minimum of 10 years with a maximum of life imprisonment. 21 U.S.C. § 841(1)(A)(viii). 5 grams of more of methamphetamine triggers a mandatory minimum of 5 years with a maximum of 40 years imprisonment. 21 U.S.C. § 841(1)(B)(viii). "The Commission has used the sentences provided in, and equivalences derived from, the statute (21 U.S.C. § 841(b)(1)), as the primary basis for the guidelines sentences." U.S.S.G. § 2D1.1, comment., 8(A).

In 2010, a mandatory minimum penalty applied in 83.1% of methamphetamine cases, the highest rate of any drug type. MANDATORY MINIMUM REPORT at 153. For methamphetamine cases carrying a mandatory minimum, more than half (58%) of the offenders received relief from a mandatory minimum at sentencing. *Id.* at 227. About one quarter of those methamphetamine offenders (26.8%) received relief from the safety valve. *Id.* For providing substantial assistance to the prosecution, 21.2% of the methamphetamine offenders received relief from the mandatory minimum penalty. 10% of methamphetamine offenders received relief from both the safety valve and substantial assistance motions. *Id.* For methamphetamine offenders subject to the mandatory minimum at sentencing, the average sentence length in 2011 was 144 months. *Id.* at 229. This is the highest average sentence length for any drug type. *Id.* For methamphetamine offenders who received relief from the mandatory minimum, the average sentence length was 72 months. *Id.* at 230. Less than forty percent (38.3%) of all methamphetamine offenders subject to a mandatory minimum in 2011 received a sentence within the Guidelines range. *Id.* at 231.

"No other drug is punished *more* severely based on purity." Amy Baron–Evans, Deconstructing the Meth Guidelines, Presentation for the Sentencing Resource Counsel, Federal Public and Community Defenders, at 12, available at txn.fd.org/Meth.pps. The Commission assumed that offenses involving actual methamphetamine are more severe than offenses involving mixtures of methamphetamine. The Commission reasoned: "Since controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs." U.S.S.G. § 2D1.1., cmt. n.26(c). While it may seem logical to punish a pure substance more than mixed substance, there is no support in the legislative history to explain the formula underlying greater methamphetamine purity to greater months of imprisonment. *See* Amy Baron–Evans, Deconstructing the Meth Guidelines, Presentation for the Sentencing Resource Counsel, Federal Public and Community Defenders, at 12, available at txn.fd.org/Meth.pps. This issue is heightened when the offender was merely a courier or mule who has no knowledge of the purity of the methamphetamine he or she is transporting. In an exchange in *United States v. Santillanes*, the court recognized the unwarranted disparity created by the methamphetamine Guidelines:

**AUSA:** But the Sentencing Commission has evolved its calculation of the guidelines based upon the evolution of whatever information was available to them.

**The Court:** Which may or may not be politics.

**AUSA:** Right, sir . . . . I don't know that it has any scientific basis. All I know, Your Honor, it's been looked at over time and has changed and evolved, which would imply that there was been—it could have been political, but it would certainly imply that somebody has looked at something . . .

**The Court:** I find that there is no empirical data or study to suggest that actual purity should be punished more severely by an arbitrary increase of the four levels in this case or at the higher level. It seems to be black box science, as best I can determine. I probably would not allow it under *Daubert,* based on what I know at present. It seems to be contrary to any empirical evidence, and really undermines Section 3553(a), as it does create an unwarranted disparity. It seems to me that this is not even a rough approximation to comply with 3553, and is not really based on any consultation or criminal justice goals or data.

Jennifer Niles Coffin, *Where Procedure Meets Substance: Making the Most of the Need for Adequate Explanation in Federal Sentencing,* CHAMPION, Mar. 2012, at 36 (quoting Transcript of Sentencing Hearing, *United States v. Santillanes,* No. 07–619 (D.N.M. Sept. 19, 2009), available on PACER at https://ecf.mmd.uscourts.gov/doc1/12111917143). With its focus on quantity, the Guidelines' system "was designed to punish bigger distributors more harshly, but that result cannot be achieved when the presumptive purity assigned under the Guidelines' scheme does not correlate to the actual purity of the drug being distributed and does not reflect the reality of the market for that drug." *Ortega,* 2010 WL 1994870, at *7.

In *United States v. Newhouse,* 919 F.Supp.2d 955 (N.D.Iowa.2013), I questioned whether there is a factual or logical basis for a relatively low amount of methamphetamine to trigger a five-year mandatory minimum:

Compared to methamphetamine, marijuana, once stripped from the plant, takes 20,000 times greater quantity (100,000 grams) to trigger a five-year mandatory minimum. Compared to methamphetamine, powder cocaine takes 100 times greater quantity (500 grams) to trigger a five-year mandatory minimum. Compared to methamphetamine, heroin takes twenty times greater quantity (100 grams) to trigger a five-year mandatory minimum. Compared to methamphetamine, crack, after the passage of the Fair Sentencing Act, now takes nearly six times greater quantity (28 grams) to trigger a five-year mandatory minimum. *See* 21 U.S.C. § 841.

*Newhouse,* 919 F.Supp.2d at 962–63 n. 9, 2013 WL 346432, at *6 n. 9. In light of research revealing the assumptions behind the crack/powder disparity, it is important to examine the underlying assumptions of the methamphetamine Guidelines. *United States v. Gully,* 619 F.Supp.2d 633 (N.D.Iowa 2009) (discussing how the origin of the crack/powder cocaine disparity was based on Congress's overblown fears of a crack epidemic and assumptions about the relative harmfulness of crack cocaine and powder cocaine, not supported by proper research and data). Table A, as set forth in the Appendix, illustrates a comparison of Guidelines ranges for different drug types, using Hayes's drug quantity as a starting point. The level of harmfulness is difficult to measure and many drug abuse experts contend that methamphetamine is not the most harmful drug. *See* Amy Bar-

on–Evans, Variance, Departures, and Deconstructing the Meth Guidelines: Current Trends and Cautionary Tales, CJA Trial Panel Annual Training (Dec. 12, 2012), at 119, *available at* http://ca7.fd.org/Indiana_Southern/Documents/Baron–Evans–% 20Slides.pdf. For example, a study by David J. Nutt and colleagues consistently ranks alcohol, heroin, and crack cocaine as more harmful than methamphetamine. David J. Nutt et al, Drug Harms in the UK: a multicriteria decision analysis, 376 THE LANCET 1558 (2010). "For legislative purposes, drugs have mostly been classified according to their addictive potency. Such classifications, however, lack a scientific basis." Jan van Amsterdam et al, *Ranking the Harm of Alcohol, Tobacco and Illicit Drugs for the Individual and the Population,* 16 EUR. ADDICTION RESEARCH 202, 202–204 (2010) (ranking the mean harm scores of crack cocaine, heroin, tobacco, and alcohol higher than methamphetamine).

██ This review of the history of the methamphetamine Guidelines illustrates how the Guidelines were crafted by Congressional directive and not precise analysis and empirical research. "A district court's authority to vary from the applicable Guidelines range due to a policy disagreement is at its greatest when the offense Guidelines at issue are not the product of the Commission's empirical analysis and technical expertise." *Diaz,* 2013 WL 322243, at \*3. Thus, the methamphetamine Guidelines are entitled to less deference than those Guidelines that were based on the Commission's exercise of institutional expertise and empirical analysis. *See Woody,* 2010 WL 2884918, at \*10 (acknowledging that "the drug offense Guidelines ... were promulgated pursuant to Congressional directive rather than by application of the Sentencing Commission's unique area of expertise" and "afford[ing] them less deference than

it would empirically-grounded Guidelines.").

#### b. The methamphetamine Guidelines are excessive

The methamphetamine offense Guidelines are excessive because they subject all defendants to harsh treatment, regardless of their role in the offense. "The Commission's lineage of the Guidelines ranges for drug trafficking offenses to the ADAA's weight-driven regime has resulted in a significantly more punitive sentencing grid than Congress intended in passing the ADAA." *Diaz,* 2013 WL 322243, at \*6. This problem of the current drug trafficking regime, "in which offenders of widely differing culpability receive unreasonably similar sentences," has been called "excessive uniformity." Eric L. Sevigny, Excessive Uniformity in Federal Drug Sentencing, 25 J. QUANT. CRIMINOL. 155, 156 (2009). "Excessive uniformity in drug sentencing has its genesis in guideline-based rules of sentencing, including an overemphasis on drug quantity, the 'relevant conduct' standard, and the narrow scope and applicability of culpability-based sentencing adjustments." *Id.* The original Commission focused on quantity since "the amount of drugs was more easily quantifiable than role in the offense and, it was thought, quantity would serve as a good proxy for role." *Id.* "[D]rug quantity is sometimes a plausible surrogate for an offender's dangerousness, culpability or level of organizational responsibility. At best it is a crude surrogate." Stephen J. Schulhofer, *Assessing the Federal Sentencing Process: The Problem is Uniformity, Not Disparity,* 29 AM. CRIM. L. REV. 833, 851–73 (1992). Changes in the drug trade have resulted in larger drug quantities, making the large quantity indicator of responsibility ineffective. *Id.*

Quantity is a particularly poor proxy for defendants who played a minor role in the drug trade. In *United States v. Nincehelser*, the defendant was a "small player," since her "role was to purchase precursor chemicals." *Nincehelser* at *6. Judge Bataillon observed that "in view of her attenuated role in the conspiracy, this is one of the cases in which the quantity determination does not serve as a reliable proxy for culpability." *Id.* In *Hubel*, a case involving "an addict recruited by her manipulative boyfriend to act as a go-between in drug transactions," Judge Bataillon discussed his concerns with the Guidelines system:

> The Guidelines' quantity-driven, "market-oriented" approach is not a proxy for culpability in every case, nor does it always correlate to the purposes of sentencing under 18 U.S.C. § 3553(a). Drug quantity is only an accurate measure when it corresponds to a defendant's position in the typical hierarchy that characterizes most drug conspiracies. Where the defendant falls in this hierarchy is an important factor in the court's assessment of a defendant's ultimate culpability. Although the quantity-based system was designed to punish bigger distributors more harshly, charging practices and the government's control over the number and amount of controlled buys from undercover agents can result in an erroneous impression that a long-term, small-quantity distributor is a large-quantity distributor.

*Hubel*, 625 F.Supp.2d at 853. Similarly, Judge Gertner recognized the same flaw in the Guidelines in *United States v. Cabrera*, 567 F.Supp.2d 271, 273 (D.Mass.2008), where the defendant, a mere deliveryman in a cocaine scheme, "was caught—quite literally—holding the bag." 567 F.Supp.2d 271, 272 (D.Mass.2008). Judge Gertner described Cabrera as a "classic case of false uniformity":

> False uniformity occurs when we treat equally individuals who are not remotely equal because we permit a single consideration, like drug quantity, to mask other important factors. Drug quantity under the Guidelines treats as similar the drug dealers who stood to gain a substantial profit, here the purchaser who escaped, and the deliveryman, Cabrera, who received little more than piecework wages.

*Id.* at 273 (varying downward and rejecting the cocaine Guidelines on the basis of "the over-emphasis on quantity and the under-emphasis on role in the offense"). Judge Gertner identifies two fundamental problems with the Guidelines system: "the overemphasis on quantity and the under emphasis on role in the offense." *Id.* at 275.

The methamphetamine Guidelines range is overinclusive, because it subjects all defendants to harsh treatment, not just the managers and leaders of the drug enterprise. The Commission's analysis of a 15–percent sample of fiscal year 2009 drug cases indicates that the mandatory minimum penalties for drug offenses have a wider reach than Congress intended:

> The majority of offenders in nearly every function, including low-level Secondary and Miscellaneous functions, were convicted of an offense carrying a mandatory minimum penalty, although higher level functions tended to be convicted of such statutes at higher rates. The Commission's analysis found that, for every function, the quantity of drugs involved in the offense resulted in a base offense level that included or exceed the five-year mandatory minimum penalty. Furthermore, the Commissions' analysis revealed that the quantity of drugs involved in an offense was not closely related to the offender's function in the offense.

MANDATORY MINIMUM REPORT.

The Commission organizes offenders on a continuum of decreasing culpability:

- High–Level Supplier/Importer: Imports or supplies large quantities of drugs (one kilogram or more); is near the top of the distribution chain; has ownership interest in the drugs; usually supplies drugs to other drug distributors and generally does not deal in retail amounts.
- Organizer/Leader: Organizes or leads a drug distribution organization; has the largest share of the profits; possesses the most decision-making authority.
- Grower/Manufacturer: Cultivates or manufactures a controlled substance and is the principal owner of the drugs. .
- Wholesaler: Sells more than retail/user-level quantities (more than one ounce) in a single transaction, purchases two or more ounces in a single transaction, or possesses two ounces or more on a single occasion, or sells any amount to another dealer for resale.
- Manager/Supervisor: Takes instruction from higher-level individual and manages a significant portion of drug business or supervises at least one other coparticipant but has limited authority.
- Street–Level Dealer: Distributes retail quantities (less than one ounce) directly to users.
- Broker/Steerer: Arranges for drug sales by directing potential buyers to potential sellers.
- Courier: Transports or carries drugs using a vehicle or other equipment.
- Mule: Transports or carries drugs internally or on his or her person.

MANDATORY MINIMUM REPORT at 166–67. More than half of the methamphetamine offenders in every role category were subject to a mandatory minimum. *Id.* The majority of defendants in methamphet-amine offenses are neither managers nor leaders. *See* U.S. SENTENCING COMM'N, 2012 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS Table 40 (2012) (providing data that shows approximately 93.8% of methamphetamine defendants sentenced in 2012 were not leaders). However, the Guidelines ranges for methamphetamine offenses are triggered by quantity, so all offenders, whether they are managers or not, receive an elevated penalty as long as the offense meets the threshold quantity of methamphetamine. The vast majority of offenders are subjected to the harsh sentencing system that Congress intended for only the leaders. The leaders receive an escalated sentence.

The methamphetamine Guidelines are fundamentally flawed because they fail to consider additional factors beyond quantity. The system is too severe in the indiscriminate way it treats offenders. Efforts by Congress and the Commission to mitigate the severity of the Guidelines "commendable in sprit, amount to gnats around the ankles of the elephant." *Diaz*, 2013 WL 322243, at *7. Since the methamphetamine Guidelines are fundamentally flawed, I find that they fail to promote the purposes of sentencing under 18 U.S.C. § 3553(a).

### c. The methamphetamine Guidelines ranges are not heartlands

In the original Sentencing Guidelines Manual of 1987, the Commission described the role of the Guidelines:

The Commission intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.

U.S. Sentencing Guidelines Manual § 1.6 (1987). The Commission explained its policy for departures, predicting that departures would be rare because "the guidelines, offense by offense, seek to take account of those factors that the Commission's sentencings data indicate make a significant difference in sentencing at the present time." *Id.* at 1.7.

Despite the Commission's intention to make each guideline a heartland, sentencing data over the years reveal that the Guidelines range for methamphetamine offenses do not constitute the typical case or heartland. "The Guidelines ranges are not now, and have never been, the 'heartlands' the Commission sought to establish." *Diaz*, 2013 WL 322243, at *9. According to the Commission's national data for drug-trafficking offenses in 2012, 42.9% of the sentences were within the Guidelines range, 0.9% were above, and 56.3% were below. U.S. Sentencing Comm'n, 2012 Sourcebook of Federal Sentencing Statistics, Table 27A. Of the sentences below the guidelines range, 37% were government sponsored and 19.3% were non-government sponsored. *Id.* "Aggravating circumstances occur just as frequently as mitigating ones, so if the Commission had gotten it right, the number of sentences below the applicable range would be at least roughly equal to the number of above-range sentences." *Diaz*, 2013 WL 322243, at *8. This pattern indicates that the Guidelines range for methamphetamine offenses is not typical and needs to be adjusted. *See id.* Sentences below the Guidelines are not an exception, but the standard. During the post-*Gall* period, from December 11, 2007 to September 30, 2010, the average extent of reduction below the bottom of the Guidelines range for methamphetamine drug trafficking offenses was 29% or 30 months. Judge Patti B. Saris, Chair, U.S. Sentencing Comm'n, Prepared Testimony Before the Subcommittee on Crime, Terrorism, and Homeland Security, Committee on the Judiciary, United States House of Representatives (Oct. 12, 2011), at 41, available at http://www.ussc.gov/Legislative_and_Public_Affairs/ Congressional_Testimony_and_Reports/Testimony/20111012_Saris_Testimony.pdf.

The Court in *Kimbrough* explained that "a district court's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case 'outside the "heartland" to which the Commission intends individual Guidelines to apply.'" 552 U.S. at 109, 128 S.Ct. 558 (quoting *Rita*, 551 U.S. at 351, 127 S.Ct. 2456). Here, the heartland itself is flawed. The high number of downward departures indicates that the Guidelines range is not a heartland or typical case. It is not surprising, considering the Guidelines range for drug-trafficking offenses is not based on empirical data of past sentencing practices.

In the first Guidelines Manual, the Commission described the Guidelines as an evolving system that the Commission would shape over time. U.S. Sentencing Guidelines Manual § 1.4 (1987) ("these initial guidelines are but the first step in an evolutionary process"). Part of the Commission's mission is to "periodically review and revise, in consideration of comments and data coming to its attention, the guidelines." 28 U.S.C. § 994(*o*). The statutory mission in the current U.S. Sentencing Guidelines Manual advises that the "guidelines-writing process [is] evolutionary" and expects "that continuing research, experience, and analysis will result in modifications and revisions to the Guidelines through submission of amendments to Congress." U.S. Sentencing Guidelines Manual § 1.A.2 (2012). Despite statistics illustrating the ill-fitting methamphetamine offense Guidelines, the Commission has not followed through on its commit-

ment to continually revise the Guidelines in light of such experience and data.

### C. Application

The Guidelines were intended to be evolutionary in nature, and policy disagreements provide a valuable function in the process of constantly improving them. As Judge Gleeson observed, "These policy disagreements are healthy." *Diaz*, 2013 WL 322243, at *16.

■ A variance based on a policy disagreement is particularly appropriate for methamphetamine offenses because the Guidelines range results in sentences greater than necessary to achieve sentencing objectives and the Guidelines are not based on empirical data and national experience. *See Kimbrough*, 552 U.S. at 96, 128 S.Ct. 558 ("The Commission did not use this empirical approach in developing the Guidelines sentences for drug-trafficking offenses."); *Gall*, 552 U.S. at 46 n. 2, 128 S.Ct. 586 ("[T]he Sentencing Commission departed from the empirical approach when setting the Guidelines range for drug offenses, and chose instead to key the Guidelines to the statutory mandatory minimum sentences that Congress established for such crimes.").

I agree with Judge Gleeson's analysis of the flaws in the Guidelines range for drug-trafficking offenses, as it pertains to methamphetamine offenses, which constitute the majority of drug-trafficking offenses in the Northern District of Iowa. Therefore, I will follow Judge Gleeson's recommendation of reducing the penalty by one third for methamphetamine offenses in response to the fundamental problems with the methamphetamine Guidelines range. *See Spears*, 555 U.S. at 266, 129 S.Ct. 840 (explaining that once the sentencing court varies from the Guidelines based on a categorical policy disagreement, it has the authority to adopt a well-reasoned basis for sentencing). This one third reduction is a good starting point and a reasonable way

to express my policy disagreement with the Guidelines. However, lowering the Guidelines range by one third only recognizes the flaws in the Guidelines system, but it does not address the underlying problems with the current system. Therefore, after reducing the Guidelines range by one third to account for my policy disagreement, I will reserve the ability to adjust the figure upwards and downwards as I weigh the 18 U.S.C. § 3553(a) factors. This includes whether the base offense level, the weight of the drugs the defendant is held accountable for, is an accurate proxy for defendant's culpability. *See* 18 U.S.C. § 3553(a)(1) ("the nature and circumstances of the offense and the history and characteristics of the defendant"). This method will allow me to consider important factors the Guidelines do not contemplate. While I agree that the Guidelines range for methamphetamine offenses is deeply flawed, I take no position on how the Guidelines should be revised because it is not for me to decide.

As I have done with policy disagreements in prior cases, I will calculate the Guidelines range under the existing Guidelines, and then I will calculate an alternative Guidelines range based on a one third reduction. Next, I will either use or vary from that alternative Guidelines range depending upon my consideration of the 18 U.S.C. § 3553(a) factors. This methodology for determining a defendant's sentence is consistent with the three-step process reiterated by the Eighth Circuit Court of Appeals:

> The first step in the sentencing process is to determine the proper guidelines range for the defendant's sentence. *Gall v. United States*, 552 U.S. 38, 128 S.Ct. 586, 596, 169 L.Ed.2d 445 (2007); [*United States v. Thundershield*, 474 F.3d [503,] 506–07 (8th Cir.2007) ]. A court should then consider whether a departure or a variance is appropriate

and apply the factors in 18 U.S.C. § 3553(a). *Gall*, 128 S.Ct. at 596–97; *Thundershield*, 474 F.3d at 506–07. *United States v. Roberson*, 517 F.3d 990, 993 (8th Cir.2008); *see United States v. Mireles*, 617 F.3d 1009, 1012 (8th Cir.2010) ("[I]n determining an appropriate sentence, the district court ordinarily should determine first the appropriate guideline range, then decide if the guidelines permit a traditional departure, and finally determine whether the § 3553(a) factors justify a variance from this guidelines sentence.") (internal quotation marks omitted); *United States v. Rivera*, 439 F.3d 446, 447 (8th Cir.2006) ("In *United States v. Haack*, 403 F.3d 997, 1002–03 (8th Cir.2005), we outlined the procedure a district court is to follow in imposing a post-Booker sentence. First, the district court should determine the Guidelines sentencing range. Second, the district court should determine whether any traditional departures are appropriate. Third, the district court should apply all other section 3553(a) factors in determining whether to impose a Guidelines or non-Guidelines sentence."). Although "a court of appeals may apply a presumption of reasonableness when conducting substantive review of a sentence within the advisory range, 'the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.'" *United States v. Henson*, 550 F.3d 739, 740 (8th Cir.2008) (quoting *Rita v. United States*, 551 U.S. 338, 351, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007)). The Supreme Court has emphasized this point, noting that "[o]ur cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable," and that "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 555 U.S. 350, 129 S.Ct. 890, 892, 172 L.Ed.2d 719 (2009) (per curiam) (emphasis in the original).

■ In this case, I first calculated the defendant's advisory sentencing Guidelines range based on the current Guidelines and considered whether any adjustments or departures from that Guidelines range were appropriate. This calculation, based on the current Guidelines, resulted in an advisory Guidelines range of 188 to 235 months. There is a mandatory minimum of five years and a statutory maximum of forty years. I overruled Hayes's objection based on over-representation of criminal history. I granted Hayes's objection to the career offender enhancement, in part, which reduced his criminal history level from 31 to 29, rather than the level 27 Hayes requested. The resulting Guidelines range was 151 to 188 months. Next, I determined whether any traditional "departure" was appropriate, *see United States v. Washington*, 515 F.3d 861, 866 (8th Cir.2008). Since the only departure motion before me is the prosecution's motion for substantial assistance, I considered the substantial assistance motion after I considered whether to vary from the advisory Guidelines range. *See Coyle*, 506 F.3d at 683. Then, I considered the 18 U.S.C. § 3553(a) factors to determine what sentence was sufficient, but not greater than necessary, to serve the purposes of sentencing. 18 U.S.C. § 3553(a). In particular, I found Hayes's difficult upbringing to be mitigating, while his drug-trafficking for profit and failure to pay child support were aggravating. These factors ultimately balanced out and the only 18 U.S.C. § 3553(a) factor that influenced my sentence was my policy disagreement with the methamphetamine Guidelines. As explained above, I followed the lead of Judges Bataillon and Gleeson, adopting Judge Gleeson's method in *Diaz* to reduce the Guidelines range by one third on the basis of a policy rejection of the methamphetamine Guidelines. The calculations for this Guidelines range resulted in 100 months to 124 months. Based on my anal-

ysis of the 18 U.S.C. § 3553(a) factors, this resulted in a sentence of 100 months. Finally, I granted the prosecution's motion for substantial assistance under U.S.S.G. § 5K1.1 with a 25% reduction, resulting in a final sentence of 75 months. After analyzing these factors, I determined that a sentence of 75 months of incarceration was sufficient, but not greater than necessary.

### III. CONCLUSION

I find that I have the discretion to vary from the Guidelines range for methamphetamine offenses and a variance is appropriate. I am placing less weight on the Guidelines range because of my fundamental policy disagreement with the Guidelines range for methamphetamine drug-trafficking offenses. A sentence pursuant to the Guidelines range would be greater than necessary to accomplish the purposes of sentencing under 18 U.S.C. § 3553(a). For the reasons stated above, I find that defendant Willie Hayes should be sentenced to 75 months' incarceration.

A Judgment of Conviction in accordance with this Sentencing Memorandum will issue this date.

**IT IS SO ORDERED.**

### IV. APPENDIX

| Table A: Drug Type Comparison | | | | | |
|---|---|---|---|---|---|
| **Drug Type** | **Quantity** | **Base Offense Level** | **Criminal History Category** | **Guidelines Range** | **Mandatory Minimum** |
| Methamphetamine (actual) and Methamphetamine "Ice" | 35 g (at least 35 g but less than 50 g) | 30 | VI | 168–210 months | 5 years (triggered at 5 g or more) |
| Cocaine Base (Crack) | 35 g (at least 28 g but less than 112 g) | 26 | VI | 120–150 months | 5 years (triggered at 28 g or more) |
| Methamphetamine (mixture) | 35 g (at least 30 g but less than 40 g) | 22 | VI | 84–105 months | (triggered at 50 g or more) |
| Heroine | 35 g (at least 20 g but less than 40 g) | 18 | VI | 57–71 months | (triggered at 100 g or more) |
| Cocaine | 35 g (at least 25 g but less than 50 g) | 14 | VI | 37–46 months | (triggered at 500 g or more) |
| Marijuana | 35 g (less than 250 g) | 6 | VI | 12–18 months | (triggered at 100 kg) |

Source: U.S.S.G. § 2D1.1(c).